# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 22-0340V

| | |
|---|---|
| LENKA VALENTINE, | Chief Special Master Corcoran |
| Petitioner, | Filed: May 16, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Laura Levenberg*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Nina Ren*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On March 29, 2022, Lenka Valentine filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on November 12, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties negotiated, but reached an impasse and have now fully briefed entitlement and damages (ECF Nos. 18-23, 24, 26-29). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $45,000.00.

## I.     Factual Evidence
### A.  Medical Records

Petitioner received the vaccine alleged as causal on November 12, 2020. Ex. 1 at 4-5. The vaccination record does not indicate the arm of administration. *Id.*

Just under two months later (January 6, 2021), Petitioner saw orthopedist Dr. Thomas Klein for right shoulder pain. Ex. 4 at 17. She explained that she received a flu vaccine two months earlier "she believes in her right arm," and her pain also began two months earlier. *Id.* She described it as a sharp pain in her upper arm, and rated it nine out of ten. *Id.* On examination, her right shoulder exhibited limited and painful active range of motion ("ROM"). *Id.* at 18. Dr. Klein assessed her with adhesive capsulitis, administered a cortisone injection, and recommended physical therapy ("PT"). *Id.* He noted that following the injection, her forward flexion and abduction were improved, but her external rotation remained limited. *Id.*

A month later, on February 8, 2021, Petitioner underwent a PT evaluation for right shoulder pain. Ex. 5 at 65. Her PT referral lists an injury date of November 12, 2020. *Id.* at 53. The "injury/onset/change of status date," field at the top of the record states February 6, 2021,[3] but in the narrative section below the record clarifies that Petitioner "got a flu shot November 12th, she was in pain [ever] since then." *Id.* The record adds that her "initial onset [of pain was] 1 day after getting a flu shot in November 2020." *Id.* at 67. The record also states (incorrectly) that she had a cortisone injection on February 6, 2021 – the injection was done a month prior, on *January* 6, 2021. *Id.* at 65.

At the time of Petitioner's PT evaluation she had no pain, but it had previously ranged to seven out of ten at worst, and was aggravated by reaching overhead or sleeping. Ex. 5 at 65. On examination, her right shoulder active ROM was 123 degrees in flexion, 103 degrees in abduction, 59 degrees in external rotation, and 79 degrees in internal rotation, all with pain. *Id.* at 66. She had reduced strength in both shoulders, with greater deficits on the right side. *Id.* Petitioner's PT intake form indicates that the reason for her appointment was "right arm (issues since 11/20) - frozen arm post-flu shot." *Id.* at 69.

---

[3] It is unclear why this record lists February 6, 2021 here, given that it later says her pain began in November, and the PT referral lists an injury date of November 12, 2020, has an authorization effective date of January 6, 2021, and is dated January 27, 2021. Ex. 5 at 53.

Petitioner attended a total of eight PT sessions between February 8 and March 12, 2021. Ex. 5 at 6-68. By the sixth PT session on February 26, 2021, Petitioner had made "excellent progress" toward her goals. *Id.* at 32. Her right shoulder active ROM had changed only slightly, and was now 118 degrees in flexion, 100 degrees in abduction, 70 degrees in external rotation, and 87 degrees in internal rotation. *Id.* at 35. Petitioner's eighth and final PT session was on March 12, 2021. Ex. 5 at 7. She was now noted to have made "poor progress toward goals." *Id.* She continued to have difficulty pulling equipment for work and pain with prolonged driving, as well as limited active and passive shoulder ROM.[4] *Id.* Petitioner did not return for additional sessions, and was formally discharged the following month. *Id.* at 6.

Petitioner followed up with Dr. Klein on May 17, 2021. Ex. 4 at 15. She had some improvement initially in PT, followed by a worsening of her pain, although the cortisone injection had provided significant pain relief. *Id.* She now rated her pain as six out of ten. *Id.* On examination, her right shoulder ROM was 145 degrees in forward flexion and 170 degrees in abduction. *Id.* Dr. Klein recommended additional PT and stated that next steps could include a manipulation under anesthesia. *Id.* at 16. It appears that Petitioner did not do any further PT.

The following month (June 30, 2021), Petitioner returned to Dr. Klein. Ex. 4 at 10. Her pain was slightly better (five out of ten), but she still experienced pain at night that woke her, and could not carry a bag on her shoulder. *Id.* Dr. Klein ordered an MRI. *Id.* The MRI showed moderate tendinopathy of the supraspinatus and infraspinatus tendons, mild tendinopathy of the subscapularis tendon and along the long head of the biceps tendon, no discrete rotator cuff tear, mild inflammatory changes within the subacromial bursa, signal changes within the anterosuperior humeral head, and supraspinatus muscle atrophy. *Id.* at 13.

Petitioner followed up with Dr. Klein on October 4, 2021. Ex. 4 at 7. She continued to have some lasting relief from the cortisone injection, although her symptoms had begun to affect her sleep again. *Id.* She rated her pain as five out of ten. *Id.* On examination, her right shoulder ROM was "good" but painful. *Id.* at 8. Dr. Klein discussed the possibility of surgery and recommended a repeat cortisone injection, but Petitioner declined. *Id.* He was unable to exempt her from vaccinations required by her employer, but noted that because she had experienced an adverse effect from a flu vaccination, she could be allowed to forego vaccination if she met her employer's requirements. *Id.*

The following month, now almost a year after vaccination (November 3, 2021), Petitioner underwent an annual examination with Dr. Natasha Simmons Wyllie. Ex. 3 at

---

[4] The record states that she had decreased *left* shoulder ROM. Ex. 5 at 7. However, the remainder of the record refers to her *right* shoulder ROM, and Respondent states – and I agree – that the reference to Petitioner's left shoulder is likely an error. Resp. at *4 n.2.

3

36. Petitioner reported that she had a reaction to a flu vaccine a year ago resulting in frozen shoulder requiring surgery – although the record does not otherwise support a finding that Petitioner underwent surgery. *Id.* She did not report any current shoulder symptoms, and on examination her ROM was "normal." *Id.* at 36-40.

### B. Testimonial Evidence

Petitioner has filed two declarations in support of her claim. Exs. 7, 10. In the first, she states that she received the vaccine at Walgreens at about 5pm, which she describes as "rush hour," with a long line of customers. Ex. 7 at ¶ 5. She had her son with her, and was ready with her right sleeve rolled up for the injection when the pharmacist approached. *Id.* at ¶¶ 6-7. Petitioner explains that she was holding her son, and she "always hold[s] him with [her] left arm" so she can use her right arm to do other things. *Id.*

Petitioner has also represented that immediately after vaccination, she had a little bit of redness and "instant pain." Ex. 10 at ¶ 4. She did not pay much attention to it, thinking it was normal post-vaccination pain. *Id.* On the second day, she continued to feel pain, and the injection site was warm to the touch and red. *Id.* at ¶ 5. The pain worsened every day, and she could not sleep at night due to the pain. *Id.* at ¶ 6.

Petitioner currently works as a medical sales executive, and November and December are busy months, so she was then unable to see a doctor right away. Ex. 10 at ¶¶ 7, 9. She took ibuprofen daily for pain relief during this time, although it did not help much. *Id.* at ¶ 8. When her busy season at work ended, she went to an orthopedist. *Id.* at ¶ 9.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper

treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[5] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months,

---

[5] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though

the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments on Entitlement

Petitioner acknowledges that the vaccination record does not state in which arm she received the vaccine, but requests that I make a factual finding that it was administered in her right arm. Petitioner's Motion for a Ruling on the Record, filed Feb. 20, 2024, at *6 (ECF No. 26) ("Mot."). Petitioner emphasizes that at her first medical appointment for shoulder pain, she reported right shoulder pain that she related to her vaccination. Mot. at *6. And she explained that when she received the vaccine, she was holding her son in her left arm, as she always does – and for that reason, the vaccine was administered in her right arm. *Id.*

Petitioner adds that she continuously and consistently related the onset of her shoulder pain to vaccination, supporting a finding that her pain began within 48 hours of vaccination. Mot. at *7. She told her orthopedist that her shoulder pain began after vaccination, and noted on her PT intake form that she had issues with her arm since November 2020 "post-flu shot." *Id.* (citing Ex. 5 at 69). At her PT evaluation, she reported that her pain began one day after vaccination. *Id.* (citing Ex. 5 at 67). These records are supported by her supplemental declaration reporting that she had pain and redness immediately after vaccination, followed by a worsening of her pain. *Id.* And she explained that she was unable to seek care right away because November and December are her busiest months at work. *Id.*

Respondent asserts that Petitioner has not preponderantly established that her shoulder pain began within 48 hours of vaccination, noting that she did not report shoulder pain until almost two months after vaccination, and even then was unspecific about when her pain began. Respondent's Response, filed Apr. 22, 2024, at *8 (ECF No. 28) ("Resp."). It was not until almost *three* months after vaccination that Petitioner reported that her pain had begun within 48 hours of vaccination. Resp. at *8.

Petitioner replies that treatment delays alone do not undermine an assertion that a petitioner's pain began within 48 hours of vaccination, and that it is not unusual for SIRVA petitioners not to seek immediate medical care. Petitioner's Reply, filed May 3, 2024, at *2 (ECF No. 29) ("Reply").

### C. Factual Finding on Situs of Vaccine Administration

I find that the record preponderantly supports a finding that Petitioner's November 12, 2020 vaccine was most likely administered in her right arm. Although the vaccination record is silent on this matter, in seeking care for her shoulder Petitioner consistently

7

related her right shoulder pain to the flu vaccine. At her first treatment appointment, she reported that she believed her flu vaccine had been administered in her right arm, the vaccine had been administered two months earlier, and her pain began in the same timeframe. Ex. 4 at 17. At her PT evaluation, she also related her right shoulder pain to vaccination, explaining that her pain began one day after vaccination. Ex. 5 at 65, 67.

Petitioner's testimonial evidence further supports this finding. She explains that she always holds her son in her left arm so that she has the use of her right arm – and for this reason, she had already rolled up her right sleeve for the vaccination when the pharmacist approached. Ex. 7 at ¶¶ 6-7. And there is no evidence suggesting that the vaccine was administered in her left arm.

### D. Factual Finding on Onset of Shoulder Pain

A preponderance of the evidence also supports a finding that Petitioner's right shoulder pain likely began within 48 hours of vaccination. Although Petitioner did not seek medical treatment for almost two months post-vaccination, such delay is not uncommon in SIRVA cases. *See Diaz v. Sec'y of Health & Human Servs*., No. 20-1003V, 2023 WL 8440873, at *8 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset occurred on day of vaccination, even though the petitioner did not seek treatment until over three months later); *Graczyk v. Sec'y of Health & Human Servs*., No. 21-0376V, 2023 WL 4573868 (Fed. Cl. Spec. Mstr. June 16, 2023) (finding onset within 48 hours where Petitioner first sought care two months after vaccination). While this length of treatment delay may have implications for the severity of the injury – and thus damages – it does not disqualify a claim if the record otherwise preponderantly supports a finding that the petitioner's pain began within 48 hours of vaccination. *See Holveck v. Sec'y of Health & Human Servs*., No. 22-0095V, 2024 WL 5349130, at *7 (Fed. Cl. Spec. Mstr. Dec. 5, 2024) (a three-month delay in seeking care does not mean the onset of pain was not within 48 hours if the record otherwise supports such a finding, but may be relevant to damages).

In this case, when Petitioner first sought treatment, she related her right shoulder pain to her flu vaccination two months earlier. Ex. 4 at 17. The following month, she explained that she had been in pain *ever since* her vaccination on November 12, 2020, specifying that her pain began "1 day after getting a flu shot." Ex. 5 at 65, 67. Petitioner explained that November and December are the "busy season" in her work, leading her to postpone seeking medical care for her shoulder until January. Ex. 10 at ¶¶ 7, 9.

### E. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

Petitioner's success in meeting the remaining QAI requirements is not disputed,[6] and I find that they have been preponderantly satisfied. The record does not contain

---

[6] Respondent does not raise any arguments concerning the remaining SIRVA Table QAI requirements or statutory requirements. Resp. at *7-8.

preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Exs. 2, 3. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Exs. 4, 5.

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 1 at 4-5. She experienced residual effects of her injury for more than six months. Ex. 4 at 15-16. And she states that she has never received an award or settlement of a civil action for her vaccine-related injury, nor has she filed a civil action. Ex. 7 at ¶ 10. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section I-II of *Timberlake v. Sec'y of Health & Human Servs.*, No. 20-1905V, 2025 WL 721730 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00," in addition to certain unreimbursable expenses resulting from the vaccine-related injury. Section 15(a)(1), (a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[7]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $65,000.00, relying on decisions in *Russo*, *Johnson*, and *Hamilton*, which involve awards of $63,000.00, $65,000.00, and $60,000.00, respectively. Mot. at *10-11.[8] Petitioner asserts that she sought care less

---

[7] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[8] *Russo v. Sec'y of Health & Human Servs.*, No. 20-1491V, 2022 WL 4717927 (Fed. Cl. Spec. Mstr. Aug. 31, 2022); *Johnson v. Sec'y of Health & Human Servs.*, No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec.

than eight weeks after vaccination, had four orthopedic appointments and eight PT sessions, received a cortisone injection, underwent an MRI, and continued to have shoulder pain 11 months after vaccination. Mot. at *11. She asserts that her treatment is similar to *Russo* and *Hamilton* in that she also had orthopedic consults and PT, although Ms. Valentine had an MRI while the *Russo* petitioner did not. *Id*. Petitioner does not seek any other damages (ECF No. 27).

Respondent proposes an award of no more than $20,000.00. Resp. at *9-14. Respondent views Petitioner's shoulder injury as mild and requiring limited treatment. *Id*. at *10. Petitioner recovered from her injury in under a year, with less than nine months of treatment including a steroid injection, eight PT sessions, and over the counter medication. *Id*. at *11. She was offered, but declined, a second steroid injection. *Id*. at *12. Her delay in seeking care also "signals the mild nature" of her injury. *Id*. at *11 (citing *Shelton v. Sec'y of Health & Human Servs*., No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021)). And although Petitioner has offered a reasonable explanation for her treatment delay – work commitments – Respondent asserts that she nonetheless was able to manage her pain with over the counter medication during that time. *Id*. at *11-12.

In Respondent's view, the cases Petitioner cites are not comparable because of Respondent's concession. Resp. at *12. Respondent asserts that his position on damages "necessarily factors in the deficiencies in the evidence that prevented respondent from conceding entitlement to compensation." *Id*. at *14. Furthermore, the petitioners in all three cases reported their shoulder pain sooner. *Id*. at *13. Respondent adds that he routinely proffers less than $37,500.00 "when it is clear that damages are worth less than in the lowest reasoned pain and suffering awards," citing *McKenna*, *Valdez*, and *McGraw*.[9] Resp. at *14.

Petitioner replies that *Valdez* is distinguishable, as that petitioner's care was limited to two visits to her primary care provider and one to an orthopedist; the petitioner declined a steroid injection and PT. Reply at *3. And even so, that petitioner was awarded $35,000.00 – more than Respondent's proposed award in this case. *Id*. The *McGraw* petitioner treated with one visit to an orthopedist, an MRI, and seven acupuncture

---

Mstr. Jan. 25, 2021); *Hamilton v. Sec'y of Health & Human Servs*., No. 21-0346V, 2023 WL 4635923 (Fed. Cl. Spec. Mstr. June 14, 2023).

[9] *McKenna v. Sec'y of Health & Human Servs*., No. 21-30V, 2023 WL 5045121 (Fed. Cl. Spec. Mstr. July 7, 2023) (identifying proffered cases with awards less than $37,500.00); *Valdez v. Sec'y of Health & Human Servs*., No. 21-394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (pain and suffering award of $35,000.00); *McGraw v. Sec'y of Health & Human Servs*., No.21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024) (awarding $37,500.00 for mild SIRVA lasting approximately six months with very conservative treatment).

sessions over a five month period – and also received a higher award than Respondent proposes. *Id.*

### C. Appropriate Compensation for Pain and Suffering

I find that the evidence preponderantly supports a finding that Petitioner's SIRVA was on the milder side, and resolved within approximately 11 months. Although she reported a high pain rating of nine out of ten at her first appointment, a cortisone injection that day improved her pain levels and ROM, and thereafter her pain ratings were lower.

The best comparables cited by the parties are *Johnson* and *McGraw*. Ms. Valentine and the *Johnson* petitioner had similar treatment, with both undergoing one cortisone injection and similar amounts of PT. The *Johnson* petitioner also received oral steroid medication and prescription pain medication, and – significantly – sought care only *two days* after vaccination – suggesting a more severe injury. The *Johnson* petitioner stopped seeking treatment – suggesting that her condition was largely resolved – after approximately six months. However, the *Johnson* petitioner continued to report shoulder pain more than two years later (without seeking additional treatment). Thus, the *Johnson* petitioner treated for a shorter period than Ms. Valentine, but had residual pain for longer.

Petitioner's case bears similarities to *McGraw* as well. A key similarity is that both petitioners delayed seeking care for nearly two months. Although individuals have varying pain thresholds and circumstances, I find that the similar treatment delay suggests that their injuries had *some* similarities in terms of their impact on the petitioner's life, and personal determination as to how urgently medical attention was needed. However, the *McGraw* petitioner stopped treatment just over five months after vaccination. For this reason, a ruling was needed on the question whether the *McGraw* petitioner had satisfied the statutory severity requirement. Although that petitioner had a reasonable explanation for stopping treatment – the start of the COVID-19 Pandemic – the evidence supports a finding that the *McGraw* petitioner's injury abated sooner than Ms. Valentine's. Additionally, the *McGraw* petitioner's ROM limitations were mild enough that this too required a fact ruling.

To the extent that Respondent argues that the mere fact that he did not concede entitlement warrants a lower damages award, the better approach is a more nuanced analysis. Evidentiary weaknesses that cause Respondent not to concede entitlement may – but do not necessarily – also affect damages valuation. *Kelly v. Sec'y of Health & Human Servs.*, No. 21-2202V, 2025 WL 1276206, at *7 (Fed. Cl. Spec. Mstr. Mar. 18, 2025). In this case, Petitioner's treatment delay is relevant not only to entitlement, but also damages: Petitioner's nearly two-month delay in seeking care suggests that she was not incapacitated or alarmed enough to need *immediate* care. However, the fact that the vaccine administrator did not record the situs of vaccine administration is relevant to entitlement but not damages. A vaccine administrator's failure to record, or to correctly record, the situs of vaccine administration is a discrete event that occurs

contemporaneously with vaccination, and generally does not provide information relevant to the pain and suffering of the petitioner thereafter.

Taking the record as a whole and the proposed comparable cases into consideration, I find that $45,000.00 represents a fair pain and suffering award in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $45,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[10]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $45,000.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[10] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.